**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RONI ARJANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PENTWATER CAPITAL MANAGEMENT LP, MCH PWCM HOLDINGS, INC., and MATTHEW C. HALBOWER,<br><br>Defendants. | Case No. 1:26-cv-07884<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>Demand for Jury Trial |

Plaintiff Roni Arjang ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of the relevant publications made by Pentwater Capital Management LP ("Pentwater" or the "Investment Firm"); (b) review and analysis of relevant filings made by Avis Budget Group, Inc. ("Avis" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (c) review and analysis of Avis' public documents, conference calls, press releases, and stock chart; (d) review and analysis of securities analysts' reports and advisories concerning the Company; and (e) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the

allegations contained herein are known only to the Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities other than Defendants that (1) purchased or otherwise acquired Avis securities (including purchasers/acquirers of swaps and those who bought Avis common stock to cover a short position) or (2) sold Avis securities short (including sellers of calls who then purchased similar contracts to cover), between February 20, 2026 and April 21, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendant Pentwater was Avis' second largest shareholder, holding 2.95 million shares, or approximately 8.4%, of Avis' outstanding stock as of June 30, 2025.

3. Defendants devised a plan to manipulate the market by buying up significant shares of Avis while it was being heavily shorted, generating a short squeeze. The resulting rapid price escalation would then force short sellers to close their positions by purchasing additional shares, compounding the upward pressure on the stock and allowing Defendants to reap the benefits of Avis' artificially increased share price.

4. Defendants act of manipulation was to buy out a significant portion of Avis' outstanding shares while further increasing its economic stake through additional put options and calls. Defendants did so despite no significant change to Avis' fundamentals that would justify sharply increasing their stake in the Company.

5. On February 24, 2026, Pentwater disclosed in a Form 3 filed with the SEC that as of February 20, 2026, Pentwater had increased its stake in Avis to more than 10%, attesting to ownership of 3,562,100 shares.

6. The following day, on February 25, 2026, Avis closed at $92.90 per share.

7. Throughout the next two months, Pentwater rapidly increased its holdings in Avis in an effort to manipulate the stock into a short squeeze.

8. Because of Defendants' actions, Plaintiff and similarly situated investors were subjected to a short squeeze, forcing them to close their positions.

9. The combination of Pentwater shoring up a significant portion of Avis' outstanding stock and responsive effort from those with short positions to close and buy additional shares, created a feedback loop which further increased the price of Avis' stock.

10. On April 7, 2026, Pentwater attested it had increased its holdings to 22.2% of Avis' outstanding shares. The Investment Firm now held more than 7.8 million shares of Avis stock.

11. Following this disclosure and the impact of the significant increase in Pentwater's stake, the stock price began to aggressively climb.

12. By April 21, 2026, Avis' stock price had surged to close at $713.97, a staggering 668.5% increase over the company's February 25, 2026 closing price just two months prior. The rapid increase caused investors to purchase Avis common stock at wildly inflated prices.

13. On April 21, 2026, Pentwater held 7,824,100 shares in Avis stock.

14. On April 22 and 23, 2026, Pentwater finalized its scheme, selling a significant portion of the Avis shares it had acquired since February, approximately 4.3 million shares, realizing gains of about $1.75 billion.

15. The stock price reacted in accord: from a closing price of $713.97 on April 21, 2026, to a closing price of $229.14 on April 23, 2026, the stock had collapsed by $484.83. Pentwater's sharp stock sale had triggered a nearly 68% decline in Avis' stock price in just two days.

16. During an earnings call on April 29, 2026, Avis's Chief Executive Officer, Brian J. Choi, pointed to Pentwater's trading actions as the source for the sharp swing in stock price. The executive further claimed Pentwater "acknowledged" that the sale was partly "violative of the SEC Section 16 short swing profit rules."

17. Pentwater continued to sell more of its Avis' stock over the next several days. By April 30, 2026, Pentwater had sold more than 5 million shares of Avis' stock in only a month as indicated by a Schedule 13G/A filing from the Investment Firm. Pentwater divested its share down to only 7.3% of Avis' holdings. Pentwater attested it now held approximately 2.59 million shares of Avis' stock.

18. In reaction to the filing, Avis' stock price fell further to a closing price of $145.75 on May 8, 2026. The stock fell nearly $570 from its peak on April 21, 2026, a nearly 80% decline in stock price in just over two weeks.

## JURISDICTION AND VENUE

19. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

20. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

22. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Pentwater maintains offices in this District and a significant portion of its

business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

23. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

24. Plaintiff purchased Avis common stock at artificially inflated prices during the Class Period and was damaged upon the realization of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Avis is attached hereto.

25. Nonparty Avis Budget Group, Inc. is a Delaware corporation with its principal executive offices located at 379 Interpace Parkway, Parsippany, NJ 07054. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "CAR."

26. Defendant Pentwater Capital Management LP is a Delaware partnership with its principal executive offices located at 1001 10th Avenue South, Suite 216, Naples, FL 34102.

27. Defendant MCH PWCM Holdings, Inc. ("Pentwater Holdings") is a Florida corporation with its principal executive offices located at 1001 10th Avenue South, Suite 216, Naples, FL 34102. Pentwater Holdings is the general partner of Defendant Pentwater.

28. Defendant Matthew C. Halbower ("Halbower") was, upon information and belief and at all relevant times, the Chief Executive Officer and President of Pentwater Holdings. Defendant Halbower also served as the signatory of record on Defendant Pentwater's SEC filings in relation to its Avis stock holdings.

29. Defendant Halbower is sometimes referred to herein as the "Individual Defendant." Pentwater and Pentwater Holdings, together with the Individual Defendant, are referred to herein as the "Defendants."

30. Defendant Halbower is liable for the manipulative acts and deceptive course of conduct pleaded herein, as those actions were the result of his direct control and authority over Pentwater's trading strategies and regulatory filings

31. Pentwater is liable for the acts of the Individual Defendant, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

32. The scienter of the Individual Defendant, and other employees and agents of the Investment Firm are similarly imputed to Pentwater under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

33. Pentwater is a private investment firm founded in April 2007.

34. Upon information and belief, Pentwater first publicly disclosed its ownership stake in Avis on May 15, 2025; at that time, Pentwater held 2.39 million shares of Avis' common stock, approximately 6.8% of the Company's outstanding shares.

### *The Defendants Manipulated the Market by Suddenly Acquiring a Significant Portion of Avis' Shares, Artificially Inflating Avis' Share Price*

*February 24, 2026*

35. On February 24, 2026, Pentwater filed a SEC Form 3 attesting that on February 20, 2026, the Investment Firm became a 10% owner in Avis.

36. Defendant Halbower executed the SEC Form 3 in his own capacity and as the CEO of Defendant Pentwater's general partner, Pentwater Holdings.

37. Notably, the SEC Form 3 specifically indicated Pentwater owned 3,562,100 shares in Avis as of February 20, 2026.

38. Pentwater had increased its stake from a previous Schedule 13G/A filing on August 14, 2025, where Defendant Halbower attested Pentwater held only 8.4% of Avis' stock, approximately 2.95 million shares, as of June 30, 2025.

39. According to Avis 2025 10-K, filed February 19, 2026, Avis had 35,258,652 shares outstanding as of February 13, 2026.

*March 6, 2026*

40. On March 6, 2026, Pentwater filed a Schedule 13G/A, updating its share count to 4,327,200 or 12.3% of the voting class of Avis' stock as of February 28, 2026.

41. Similarly, Defendant Halbower executed the Schedule 13G/A in both his individual capacity, and as the Chief Executive Officer of Pentwater Holdings, acting as general partner for Defendant Pentwater.

*March 27, 2026*

42. On March 27, 2026, Avis filed a prospectus supplement detailing the sale of up to 5 million additional shares of Avis, in pertinent part:

> We have entered into an equity distribution agreement … relating to our shares of common stock, par value $0.01 per share (the "common stock"), offered by this prospectus supplement and the accompanying prospectus. In accordance with the terms of the equity distribution agreement, we may offer and sell up to 5,000,000 shares of our common stock from time to time through sales agents pursuant to this prospectus supplement and the accompanying prospectus.

*April 7, 2026*

43. On April 7, 2026, Pentwater filed yet another Schedule 13G/A in order to update its ownership stake in Avis. Defendant Halbower certified that Pentwater held 7,824,100 shares of Avis, representing a significant 22.2% of its outstanding shares, as of March 31, 2026.

*April 21, 2026*

44. As of April 21, 2026, Pentwater was again holding 7,824,100 after the investment firm reacquired additional securities, pursuant to a Form 4 filed by the Investment Firm on April 23, 2026.

45. Throughout the above period, Defendants engaged in a scheme to manipulate the market price of Avis' stock. Pentwater, as attested by Defendant Halbower individually and on behalf of Pentwater's general partner, Pentwater Holdings, aggressively and swiftly increased its ownership stake in Avis despite no newsworthy events or shift in Avis' fundamentals to justify the sharp increase. In doing so, Pentwater created a "short squeeze," forcing short sellers to mirror Pentwater's share acquisitions to cover potential losses. Those that were short on Avis were justifying in remaining so as the underlying fundamentals of the company had remained unchanged despite Pentwater's aggressive stock acquisitions. While it may have appeared to investors and shortsellers alike that Pentwater was potentially acting on insider information or was otherwise reinforcing its long-term stake in the Company, the truth would soon be revealed when Pentwater elected to dump more than the entirety of its Avis' stock acquisitions in the recent months.

***Pentwater Capitalizes on the False Growth it Created***

*April 22-23, 2026*

46. Over a two-day span from April 22 to April 23, Pentwater sold 4.3 million shares of Avis' stock, generating proceeds of approximately $1.75 billion.

47. Investors saw the stock decline in accord, from a closing price of $713.97 on April 21, 2026, to a closing price of $229.14 on April 23, 2026. The stock had collapsed by $484.83, a nearly 68% decline in just two days triggered by Pentwater's sharp stock sale.

*April 29, 2026*

48. On April 29, 2026, Avis conducted an earnings call corresponding to its first quarter fiscal 2026 results. During the call, Chief Executive Officer Brian J. Choi addressed the significant stock movement, placing the blame on Defendant Pentwater, in pertinent part, as follows:

> I want to address what I know is top of mind for many of you, the recent volatility we've seen in our stock price. We've received a number of questions, so I think it's worth taking a moment to walk through the facts as we understand them based on disclosure from public filings.
>
> Let's start with what's well understood. ***Our second largest shareholder, Pentwater Capital, who filed as a 9% owner of our company as of December 31, 2025, crossed the 10% ownership threshold on February 20 and became a Section 16 insider. On that day, Pentwater disclosed they held an economic interest of 39% of our company through stock and cash settled swaps***. By March, they disclosed that economic ***interest increased to 51%. So in the span of a month***, Pentwater's public filings showed their economic interest increased substantially. ***We believe that this significant increase in ownership, combined with the high short interest in our name resulted in a short squeeze***. That much is well understood.
>
> Here's what we're absorbing just now. ***After market closed yesterday, Pentwater disclosed the sale of 4.3 million shares for gross proceeds of $1.75 billion on April 22 and April 23. Given the quantum of shares sold in such a short span of time, our stock price experienced a significant decline***. It is important to note that Avis has not bought or sold a share since 2024. Our largest shareholder, SRS, has not bought or sold a share since 2023. So it seems the only insider active during this period of excess volatility was Pentwater Capital.
>
> ***Pentwater has acknowledged that its sale of Avis stock, at least in part, was violative of the SEC Section 16 short swing profit rules***. Avis has requested Pentwater furnish it all relevant information concerning the trades and Avis will aggressively pursue all rights on behalf of our stockholders. From the company's perspective, nothing about how we operate the business has changed, and our focus remains squarely on execution and long-term value creation.

49. The same day, Avis filed its 10-Q with the SEC, attesting that "[a]s of April 22, 2026, the number of shares outstanding of the registrant's common stock was 35,325,986."

50. Analysts swiftly reacted to Avis' revelations, lowering price targets in accord with the news. Jefferies, for example, downgraded Avis to Hold and cut its price target 11% as they "believe[d] the stock trades at a multiple disconnected from near term fundamentals." The analyst pointed to "significant volatility" "tied to the activity by one of the company's largest shareholders and the continued unwind of a historically large short squeeze."

51. The analyst highlighted key events to justify their downgrade, summarizing, in pertinent part:

> All told, with Pentwater's increased interest paired with SRS not selling, and the company not issuing any new shares, ***the company's stock price soared as there were no shares that could be purchased to satisfy the short***.
>
> . . . Post these events, ***Pentwater sold 4.3mm shares for gross proceeds of $1.75bn***. That said, mgmt. noted that Pentwater acknowledged that its sale of Avis stock, at least in part, violated the SEC section 16 short-swing profit rule.

(Emphasis added).

52. JPM similarly cut its price target following Avis' first quarter report. In pertinent part, the analyst confirmed Avis had not issued any of the additional common stock pursuant to its March prospectus and highlighted the influence of Pentwater on Avis share price, stating, in pertinent part:

> It was subsequently confirmed, however, that ***the company did not, in fact, issue any of the 5 mn potentially new shares and it was instead the selling of 4.3 mn existing shares over the course of April 22 and 23 by Pentwater Capital*** (for gross proceeds of ~$1.75 bn) that eased the squeeze. ***With the squeeze economics having accrued directly to Pentwater rather than to the company*** (and, indirectly, its broader shareholder base), the capital markets optionality we earlier saw for the company is no longer in play. As such, we are lowering our target EBITDA multiple from 9.5x to 8.75x

(Emphasis added).

*April 30, 2026*

53. On May 7, 2026, Pentwater filed an updated Schedule 13 G/A. In the filing, Defendant Halbower attested that, as of April 30, 2026, Pentwater had drastically cut its share of Avis stock down to 7.3%, or 2.59 million shares.

54. The Investment Firm had sold more than 5 million shares or nearly 67% of its ownership of Avis' stock in a matter of days.

***Additional Scienter Allegations***

55. During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that Pentwater's actions and buying behavior would send Avis shares into a significant 'short squeeze' position.

56. Pentwater was, upon information and belief, aware of Avis' valuation at all relevant periods and had knowledge of the high short-interest-to-float ratio of Avis' stock. As such, Defendants were aware that by substantially intentionally and independently increasing the buying pressure on Avis' stock, investors with a short position in the Company would be forced to buy shares to cover the squeeze, creating a feedback loop and artificially elevating the price of Avis' stock.

57. Defendants' scienter was further evidence by their decision to suddenly acquire a significant number of Avis' shares. Pentwater's holdings jumped from less than 10% holdings in February, 2026, to over 22% in just two months. Historically, before February 2026, Pentwater had retained between 6% and 9% of Avis' shares.

58. Moreover, Defendant Pentwater liquidated its gains even faster, swiftly returning to a smaller position than Pentwater had attained even by August of 2025. Defendants' effort to

quickly realize gains on the shares and dump the stock further evidences their manipulative act as it is clear Defendants had no intention of reinforcing or enhancing their long-term position in Avis.

59. Indeed, Pentwater's trading served no legitimate economic purpose other than to artificially distort the price of Avis stock to force a short squeeze, from which they intended to, and certainly did, reap the illicit profits.

60. Defendants ultimately acknowledge a violation of Section 16's short swing profit rules, according to Avis' management. This further evidences Defendants scienter as they knew they were acting as insiders of Avis and owed a duty to its shareholders, yet deliberately disregarded those regulatory guardrails to achieve the fruits of their manipulative scheme.

***Loss Causation and Economic Loss***

61. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct and manipulative acts that artificially inflated the price of Avis' common stock and operated as a fraud or deceit on Class Period purchasers of Avis' common stock by manipulating the investing public. Later, Defendants' prior scheme came to fruition as they offloaded nearly 70% of their Avis' shares, earnings profits of more than $1.75 billion. As a result of their purchases of Avis' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

62. Avis' stock price fell in response to Pentwater selling a sizeable portion of its shares. Defendants sold approximately 4.3 million shares on April 22 and 23, 2026. Correspondingly, Avis' share price fell from a closing price of $713.97 on April 21, 2026, $229.14 on April 23, 2026.

***Presumption of Reliance; Fraud-On-The-Market***

63. At all relevant times, the market for Avis' common stock was an efficient market for the following reasons, among others:

(a) Avis' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Avis communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Avis was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Avis was reflected in and incorporated into the Company's stock price during the Class Period.

64. As a result of the foregoing, the market for Avis' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Avis' stock price. Under these circumstances, all investors with short positions in Avis' common stock during the Class Period suffered similar injury through the rapid artificial inflation of Avis' common stock due to the actions of Defendants, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, and were damaged by the Defendants' market manipulation scheme. Excluded from the Class are defendants herein, Avis, the officers and directors of either the Investment Firm or Avis, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

66. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Avis' common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Avis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 13, 2026, there were 35.26 million shares of the Avis' common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

67. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants engaged in a scheme to manipulate the market for Avis common stock by intentionally triggering a short squeeze;

(c) whether Defendants' aggressive accumulation and subsequent rapid divestment of Avis stock was intended to, and did, artificially distort the market price;

(d) whether Defendants acted knowingly or recklessly in executing trades designed to create the false appearance of market demand and force short-sellers to cover potential losses;

(e) whether the price of Avis' common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

***Against All Defendants for Violations of***

***Section 10(b) and Rules 10b-5(a) and (c) Promulgated Thereunder***

71. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) promulgated thereunder by the SEC.

73. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period did, deceive the investing public; artificially inflate and maintain the market price of Avis common stock; and cause Plaintiffs and other members of the Class to purchase Avis common stock at artificially inflated prices.

74. This scheme was specifically designed to exploit the high short interest in Avis stock to Defendants' advantage. By aggressively and swiftly accumulating a dominant percentage of the available float, Defendants intentionally restricted the supply of shares, triggering a massive "short squeeze" that forced market participants to react to artificial price signals.

75. Notably, Defendants' actions in buying up significant stock ownership forced those with short positions to purchase additional shares to cover their losses, creating a self-reinforcing feedback loop that led to compounding, artificial increases in the stock price. No significant change in Avis' underlying fundamentals corresponded to the price increase. Rather, the price escalation resulted solely from Pentwater's manipulative trading and the resulting distortion of market mechanics.

76. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants took the following distinct, manipulative actions:

(a). Aggressively accumulating a dominant position in Avis common stock to deplete the available float, thereby ensuring the market would be hyper-sensitive to the subsequent buy orders used to trigger the squeeze;

(b). Engaging in manipulative trading patterns designed to artificially inflate the share price and create the false appearance of genuine, high-volume market demand, which intentionally forced short sellers into a "feedback loop" of panicked covering; and

(c). Capitalizing on the resulting artificial price peak by rapidly selling a significant portion of their recently acquired Avis common stock to the investing public at prices Defendants knew were disconnected from the Company's underlying economic value.

77. Defendants' liability under Subsections (a) and (c) of Rule 10b-5 arises from their direct participation in the aforementioned deceptive acts, practices, and courses of business, which are completely independent of, and separate from, any concurrent or subsequent oral or written misrepresentations made under Rule 10b-5(b).

78. Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged in acts, practices, and courses of business which operated as a fraud and deceit upon the purchasers of Avis common stock.

79. Defendants acted with scienter in that they knew or recklessly disregarded that the deceptive devices and acts they employed would operate as a fraud upon investors and would artificially manipulate the market mechanics of the security.

80. As a direct and proximate result of Defendants' deceptive and manipulative scheme and course of conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*